All rise. The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and its honorable court. Please be seated. Good morning ladies and gentlemen. We have four cases this morning from four different tribunals. A claims court case, a trade court case, a veterans court case, and an employee case. The latter being submitted on the briefs and therefore will not be argued. First case is 06-5037 Carabetta Enterprises v. United States. Ms. Vanneman. May it please the court. There are two liability issues and two breach damages issues before the court. With respect to the contract liability issue, HUD provided the direct capital loans to seven of the Carabetta properties not because of the repayment agreement, but because each qualified as a Carabetta property under the 1996 appropriations bill for 97 and each was at the top of HUD's pre-existing queue for that category of Carabetta properties. What the appropriations bill did was to completely restructure HUD's low-income housing programs, among other things, and provide appropriations for it. Why is this different from WinStar? Here, well among other things, there was no, with respect to 7X, there was no targeting of Carabetta's contract. In fact, what the legislation did was, in changing HUD's programs and really cutting back on the preservation programs of the LIPA and LIPRA, carved out certain properties, three categories, that had been delayed in processing for HUD to use in its discretion to fund. But why isn't that targeting in the sense that, yeah, they say we're setting aside a little bit of money for three programs. We know there's not enough there for all three programs to be fully funded, so why haven't they targeted those three programs to get slashed, contrary to their earlier obligations? Actually, what Congress did was repeal HUD's authority to provide the equity takeout loans, the capital 241 loans, under the old program, but provide HUD authority under a completely different and new program. And the legislation really did not target any existing 241F projects. It prevented HUD from awarding future ones, but with respect to Carabetta, did not target them specifically. There was no reference in the legislative history to Carabetta, whereas Congress knew how to reference... Help me with the record here. There was Carabetta and only one other person involved in these equity loans, wasn't there? I mean, it's a pretty... The ones with contracts. Yeah. That already had contracts in place. Contracts in place, equity loan contracts. This isn't a... We're not talking about... It's not a farmer's program where there are thousands of people involved across the country. The equity loans that Congress abrogated really applied to only Carabetta, and if I've read the record right, one other, right? It applied to future loans. It appears that Carabetta was the only property owner that had a repayment agreement, pursuant to which HUD had agreed to process the 241F loans, but when Congress enacted the legislation, it repealed that authority. The other property that was mentioned in the legislative history, nothing to do with the 241F loan, it's just that Congress knew how to mention specific projects, and it approved a transaction involving a property where... But why... Back to the point. Why isn't that targeting, really? You know it's only... Carabetta's the only one you've got the repayment agreement with, and you're the one, and you're not going to pay them. Well, there's... Unlike other cases that this court has addressed where there was targeting, like Sentex, where there was a lot of legislative history and legislative language that the court could look to that it clearly affected them. Oh, so as long as Congress does it silently, they can do it. I'm looking for a real distinction of why this isn't targeting. Sure, I understand that. Appropriation bills always are. But this provision was, bingo, gotcha, isn't it? No, there really... That wasn't the purpose on the face of the legislation. It wasn't anywhere in the legislative history of the legislation that Congress was trying to get out of this deal or anything like that. It simply precluded HUD from entering into new 241. And as kind of a phase-in, what Congress did said, well, there are some properties that have approved plans of action. There have been delays for various reasons. We'll allow $75 million out of $6 billion for HUD to use in its discretion to fund some of these if HUD decides to do that. I'm not really hearing much of a reassuring answer for how we identify what's targeting and what isn't. Well, one of the tests, I think it was post-financial as well, was that, was it just an incidental effect on some contracts? And here, that's it, unlike Sentex Guarini, where it targeted and affected a wide range of people or entities with the former tax deductions. It seems to me that there are two different ways to look at this that both present difficulties for the government's position. And maybe there's a third way to look at it that doesn't. But the problem I have is, on the one hand, you can say, and to pursue Judge Rader's line of questioning, you can say that what Congress did was to say, with respect to Carabetta, who had this repayment agreement and a contractual right to the 241F loans, you can say, well, Congress, simply by allocating only $75 million and presumably only $25 of that to the contracts, basically said, we're going to let you get the equivalent, rough equivalent of these equity loans through the capital loan program, but only to the extent of $25 million. And therefore, it seems to me, if that's right, it's no different from cancelling, let's say, a contract for a weapons system and saying, well, we'll continue the contract, but we're going to cut back on the amount you're going to get on the contract by half or two thirds. That would clearly be a breach. Congress can't simply modify a contract by that kind of declaration. I assume you'd agree with that. Yes, and in this case, Congress did not modify the contract. OK, but if, in fact, the other way you look at it is to say, well, what Congress really did is to say, we specifically don't want to target Carabetta. We want to protect Carabetta and their contract rights in general by saying, we're going to substitute an essentially equivalent program, and we're going to throw enough money into the pot so that their new loans, the capital loans, will be able to be fully funded. If Congress was not targeting them, that's why they weren't targeting them, it seems to me. But then the question is, when HUD decides not to use the full $75 million for Carabetta, but instead to give Carabetta only $25 million, why isn't HUD on the hook for effectively breaching rights that Carabetta had under the contract, or the equivalent rights that they would have had under the statute if it had been applied in full force? So there are two different ways to look at it. One is Congress does something which constitutes targeting along the lines that Judge Rader was asking, or HUD does something which constitutes a cutting back of what Congress has made available by way of relief to people, well, to Carabetta specifically. Well, HUD had the discretion on the appropriations bill to decide whether to use all $75 million, how to use it, and allocate it before March 1. And they have a contract. And why isn't the exercise of that discretion, to the extent that it cuts back on Carabetta's remedies under its contract rights, a breach of the contract? It's not a breach because, given that it was a sovereign act, Congress had the right to repeal the authority for 241F loans. And the direct capital loans were a totally different beast than the 241. They were not equivalent. They were funded pursuant to different authority. They were just different vehicles altogether. So that once Congress repealed HUD's authority under 241F, then it was up to HUD to decide how, if at all, to use the $75 million. And Carabetta had no rights at that point. And what happened was that since seven of the properties already had previously approved plans of action, so they were eligible for carve-out, for example, unlike South Fork Park, and they were at the top of the queue, they were funded. But HUD, by agreeing to do that, did not express any contemporaneous intent to fund all of the properties or made no offer to fund all of them pursuant to the repayment agreement, nor was there any unequivocal acceptance of that. There wasn't any consideration to exchange. So we disagreed with the trial court's conclusion that there was a modification to the repayment agreement by HUD. So assuming Congress didn't redo the contract, our position is that HUD did not breach any modified repayment agreement either. I'm struggling to understand what you're saying to us. I appreciated Judge Bryson's dichotomy. It's either targeting and WinStar or HUD exercising its discretion has breached its contract. And I'm wondering what happens to this contract. Are you saying it has ceased to exist by some act of Congress? Why isn't that targeting? Or the alternative, why isn't the discretion? I'm struggling with your answer to Judge Bryson's question, which I haven't understood. With respect to targeting, it was not targeting because it's distinguishable from any of the other cases before this. Okay, let's go beyond that one. Why isn't the other one then? The why HUD? Yeah, why hasn't HUD breached it? HUD had discretion. Once Congress repealed its authority under 241F, it could no longer comply with the repayment agreement that it would process 241F. And what it did was, with its discretion, it decided to use $25 million of the $75 million to fund. So are you telling us that in the weapons systems example or in any other example of a contract, the government could always avoid it by having Congress, in an appropriations bill, abrogate the contract, and then give a little discretion to the agency, which the agency would then decline to exercise. So we're out of any contract we want to get out of. That's the prescription. Here there was much more than that because Congress completely restructured the program. It eliminated future 241F loans. It allowed property owners to prepay. It changed the way it was going to provide subsidies. And we understand that that hit Carabetta right between the eyes, abrogating their repayment agreements. They're the ones that lost out on something they thought they had an obligation to receive. That's true. Let me ask you. May I reserve the rest of my question? We'll give you time. Please answer the question. Let me see what the government's position is with respect to an issue that seems to me to be not, so far as I can see, very different from this. I mean, suppose that Congress decides that the Marine Corps is not very good at contracting for weapons systems. It's watched the Army, the Navy, the Air Force, and the Marine Corps contracting. It doesn't like the way the Marine Corps' contracting operation works. So they say, henceforth, no more Marine Corps contracts. Now, we know that there is one contract in existence, which is the Osprey contract for the Osprey weapon system. Now, for the Osprey weapon system, we will allow the Army to take over the arrangements for the continued production of that, subject to putting a cap of $25 million on the program. Well, the contract was for $100 million, but the Army is given authority to spend up to $25 million. Does the maker of the Osprey, who has a contract with the Marine Corps, have a claim for breach of contract? Or would the government be able successfully to argue that, well, this is a very large program, in which what we've done is to change the whole way military contracts are led, particularly just to say there's no more Marine Corps contracts at all. So you have no rights to your original contract. All you get is whatever the Army decides to give you, up to $25 million. Well, there are two things. How does that case come out? What's the government's position with respect to that? Does the Osprey maker win or lose? Do you understand the hypothetical? I'm sorry, I was focusing on distinguishing it from this case. Well, first, before you distinguish it, tell me whether you think you need to distinguish it. Do you win that case? Does the government win that case? I'm not sure. In that case, it might have a harder time because there was a contract here. Once Congress repealed HUD's authority under 241, there essentially was no more contract. Well, in my case, the Marine Corps' authority has been repealed. The government has said no more contracts, past, present, or future, involving the Marine Corps. But the authority was transferred to another government entity. Another government entity was given a new right to enter into new contracts, up to $25 million for the Osprey. And that is possibly more targeting than was here because there was really no evidence in the record that Congress knew that it was Carabetta that was the only one that had the repayment agreement. Congress simply carved out three general categories of priority projects, and it turns out that it appears that Carabetta may have been the only one, but there's nothing in the legislative history to indicate that Congress knew that or was aware of that or anything else of that nature. So in my hypothetical, if the statute said any pending Marine Corps contracts are hereby terminated, it would be okay, but if it said the Osprey contract, which is pending, is terminated, there would be liability? Much more likely, yes, Your Honor. Ms. Vanneman, we'll charge that time to Judge Bryson, and we'll give you your five minutes back. Mr. Rosenbaum, we've got it for Carabetta. Thank you. May it please the Court, our view is that the dichotomy that was focused upon in the question being asked of government counsel has it exactly right, and under either circumstance we win on liability. One way to view the situation is that Congress targeted Carabetta in a protective manner, providing sufficient funds with $75 million to make sure that it was in a position to get the funding that had been promised under the repayment agreement. $75 million was more than enough to fund all the Carabetta properties. The Court of Claims didn't really reason it that way, though. It said there was a modified contract and there was reliance. Is there enough evidence in the record to support the consideration, the bargain for modification of the contract? Yes, and let me start by focusing on congressional action. Consideration can be supplied by a mutual modification of each party's rights and obligations under the preexisting contract, and that's exactly what happened here. The substitution of capital loans for the 241F loans had benefits for both sides. But there's no real evidence in the record, one way or another, that anybody is bargaining for and giving consideration for a modification in a contract. Well, the consideration does not have to be separate funds transferred as part of the modification, so long as the modification itself provides... But the record doesn't have any letters exchanged saying, well, then we can pursue this alternative way and that will substitute for your obligations, and the government saying, yes, we'll meet our earlier obligations through this new program. We don't see any of that, do we? We don't see it back and forth in the manner you described. Our principal argument here, and this is, if you will, one of the two dichotomies, but our principal argument here is that it was the congressional action itself, which Carabello was certainly willing to accept, that itself modified the agreement, that Congress made the substitution of capital... What evidence is there that the government felt they were still acting under the contract? Well, under our view of things, Congress itself is the government, of course, and therefore that action represents the government's views as to how the Carabet Agreement should go forward thereafter. And as I say, Carabet, of course, acquiesced in that... My question was more directed to HUD, of course. I appreciate that, Your Honor, and I'm simply pointing out that there are two ways to view the contract as having been modified and accepted. One way is to view it as being the 1997 Appropriations Act itself, in which case you don't need subsequent conduct by HUD showing an intent to modify. And that is, we think, a very legitimate and appropriate way to view the situation, and one we have forwarded. And the other view is... Then we've got to grapple with the targeting thing, though. Well, under this approach, the targeting was, if you will, protective targeting. That is to say, Congress said, we know there are these repayment agreements out there, and they used the phrase repayment agreement, a pretty unusual phrase, obviously, but it applied to us, and here's $75 million to fund those programs. That was protective targeting. We think that's the most appropriate way to view the situation. The $75 million, as I said, being more than enough to fund the Carabet Appropriations, with money left over for the other properties that are listed among them, and the three alternative uses of the $75 million, there certainly was money left over for the other ones as well. So you say it's a modification as opposed to an abrogation. We think under this... Obviously Congress can, under some circumstances, abrogate pre-existing contracts. Windstar was such a case, or Mobile Oil was such a case. But under this particular circumstance, where they say we are providing you $75 million, and we are substituting capital loans for 241F loans, which from our perspective was just as good, that's a modification. But if there was a modification, where was the modification accepted by Carabeta? And what were the terms of the accepted modification? The terms of the accepted modification were that the capital loans that are now being provided are acceptable to us, and we are perfectly willing to go forward under those circumstances. Now go ahead and fund our properties. And there's no breach under those conditions. But wherein did you accept? The only citation I can say, maybe there's something else in the record, but the only citation I could find to the assertion that there was acceptance was to your trial document that's at 807, which is part of a declaration in which you say these contract modifications were accepted by the Carabeta Group. Well, other than the statement... I would refer you to page 1305 of the joint appendix, Your Honor, if you're looking for a specific document. That's the October 10, 1996 letter by Carabeta that said two weeks after the Appropriations Act has been enacted, it basically says, all right, you've got the money now, HUD, fulfill the retained agreement, fund the properties. 1305? Yes. So that, in terms of indication by Carabeta that they were happy to go forward under the new regime, that's the document you look at for evidence of that, Your Honor. Of course, if one were somehow to view the 1997 Appropriations Act as a breach, then, of course, it is a targeted breach. And Judge Rader's and Judge Bryson's questions to government counsel are absolutely right. It targeted us. It's not different than Winstar if one wants to look at things in that matter.  Of course, the problem there is where did Congress indicate at all that either that it was abrogating your contract by doing away with the equity loan program or substituting something for your project by the $75 million new capital loan program? Well, I think the indication is the fact that it's all, of course, in one act, this Appropriations Act, and in the Appropriations Act, Congress simultaneously did several things. It specifically funded $75 million. It named the repayment agreements by name as a recipient of the $75 million, and it said that going forward... Yes, but the $75 million was given to HUD to be used at its discretion, and it was to be spread over three separate categories, only one of which is you. How can you say that's your money? Because HUD's discretion is cabined by its contractual obligations. HUD had no contractual obligations to the other entities to which it provided money. In that sense, it's no different than anyone else. If I enter in a contract with person A to sell in my house, and instead I sell the house to person B, I have breached the contract. I mean HUD in this circumstance had an agreement with us that obligated it to provide us certain funding that had obligations to no one else to whom it provided those funds. To give it to them, not to us, was a breach, and that was the breach in January 1997 when HUD said we're not going to give you the money necessary to fund the properties listed in the repayment agreement. What is the practical... And when I say practical, I really mean dollars and cents for all practical purposes. It's a difference between the benefits that you enjoyed under 241F and the benefits that you would have enjoyed under a fully funded capital loans program. Where I'm going with that question is it seems to be your position now, and perhaps it has been all the way through, that you were perfectly happy to accept the capital loans program as long as it was fully funded. That is to say all of the properties were covered. Is there, in fact, no real significant dollar difference between the benefits under the two programs? I got kind of lost in the footnotes over that question. They are very, very similar, to answer your question. The dollar amounts are very, very similar, and I can tell you and I can explain why. The 241F program provided a loan, which the government guaranteed, but the government then provided additional rent subsidies to your tenants to pay off the loan. So, in effect, the loan money was yours to do with it. So, Congress wanted to get rid of the Rube Goldberg aspects of that program and just say, look, we make one transaction, there's the money. Exactly. It was a very inefficient system. It wasn't very logical. They substituted a direct loan program, but from a dollar perspective, from the perspective of a recipient like Aribetta, they were very, very similar in economic effect. Thank you. Your Honor, Eli May, we have a cross-appeal as to three issues. The tax gross-up, repairs, and a southward park, if I could turn to them briefly. With respect to tax gross-up, this court has held in two decisions now, LaSalle and Home Savings, that if the monies that were to have been received under a contract would have been tax-free, but the damaged award would be taxable, then the plaintiff is entitled to a tax gross-up of the damaged award, put it in the same situation it would have been in had the contract been performed. In this circumstance, it is stipulated that the capital loans that my client should have received would have been tax-free. It is stipulated that the damaged award would be taxable. But the Court of Federal Claims says that the benefits you receive from that are all going to be taxable. Well, what the Court of Federal Claims said correctly is that any investment income we earn will be taxable. And we agree with that proposition, but it's not the right inquiry because any time you receive tax-free money, and we use the example of life insurance proceeds, which are tax-free, if I were a beneficiary of a life insurance policy on someone else and a person dies and I get the money, that's a tax-free event. Now, let's say I've gotten half a million dollars. Once I start to invest that money, I'll pay taxes on it, but the money received itself is tax-free. But it seems to me the difference there is that you don't have to pay back the life insurance. In other words, suppose your life insurance deal was we're going to give you a $500,000 loan interest-free for 10 years. Then it seems to me in that situation, which is analogous to this one, we essentially cross out the principle and we look only at the investment earnings, which is the total amount that you're really getting. The key here, of course, is that the future repayment obligation, which was far in the future, was at zero interest. What's critical is that we deduct from the capital loans the present value of that repayment obligation. And the net is our claim in this case. Right, but what is the net? The net is really, when you do that subtraction, what you're really saying is the comparison of present value and ultimate payback, the difference is what you're going to earn on the money. No, I wouldn't agree with that, Your Honor. If you could do nothing, if the universe was such that you knew that that money would not increase in value at all, then there wouldn't be any reduced present value. You'd just hold on to money. If you were told that you couldn't invest it, you would just hold on to it for 10 years and then turn it back. Yes, but of course we can invest it. The way to conceptualize this, though, is to say let's assume that the repayment obligation is 50 years in the future at zero interest, which it was for many of the properties. And let's assume I only have to put aside $25,000 which will in interest grow to be the $500,000 to repay the loan in 50 years in the future. To value what I'm getting is I take the $500,000 loan, I deduct the $25,000 that I have to set aside, and the remaining $475,000 is just pure cash to me. But that's because of the interest rate. If the interest rate went down to 0.0 and banks just said you can drop your money off but you're not going to get a thing and there was no place you could put the money, then the present value of that $500,000 would be $500,000. Agreed? Well, yes, but of course that's not the case. No, and the reason is because of the value of the investments which are taxable. But any investment of tax-free money is taxable. This court did not say in the LaSalle case or the home savings case, what income can be earned from the money those people would have received and what would the tax rate have been. What the court there said is how much money should those entities have received, period. And that's the question. I'd like to reserve the rest of my time. You may do that and we will give you five extra minutes, but I should tell you that that is for dealing with a cross-appeal for Roboto. And of course, if she doesn't deal with cross-appeal issues, you lose that. That's the nature of the game. But we'll listen to Ms. Vanderman who has five minutes left. Thank you. With respect to the Appendix 1305 that was cited, this was a letter from Carabetta written in October 1996, shortly after the Appropriations Bill, before the alleged breach in January 1997. And HUD never agreed with Carabetta's interpretation of Carabetta's rights. And in none of the other subsequent documents that HUD executed with Carabetta with respect to the properties on which it closed or other correspondence or appraisals or anything else, did HUD ever agree to this. While Carabetta believed that it acquiesced to something under the principles of what a contract is, there was no offer by HUD to substitute, so to speak, the capital loans for the equity loans. There was no acceptance. There was no consideration. But I don't understand your position to depend on whether there was a letter from Carabetta that said, you know, now we notice that this statute has been enacted and we see that there's $75 million as long as you commit any amount that's necessary to cover our loans up to $75 million, we're delighted and happy and we accept. Your position doesn't depend on the presence or absence of such a letter, correct? No, that's only support for the fact that there was no contract modification that HUD agreed to to modify the repayment agreement. And in fact, with respect to another point, the programs are very different. The direct capital loans were direct from HUD with no private lender. There was no debt service on the takeout equity because there was no interest. Under the new program, you know, Carabetta would pay the principal at the very end. They eliminate all the complexities of the former program in terms of rent subsidies and rent amounts and administrate these complicated programs. So Carabetta's case depends on the fact that this was like a substitute. It was easy to substitute and it's not the case because the programs were so very different. I don't see anything in the record that supports your side either. I don't see any instance of you saying, well, the equity loans are dead, everything's over with, and so clearly we're not continuing on with the contract at all. Whatever happens from here on out is something very different. I don't see any instance of you indicating that from your part, you were acting separately from the repayment agreement. Your Honor, in Volume 1 of the appendix, the preservation letter 97-3 dated January 24, 1997 is the letter on which the trial court relied to conclude that there was a breach of contract because in that letter... Can you give me a page? Yes, I'm sorry. Appendix 59. HUD basically said, this is how we're going to implement the appropriations bill. But that looks like an internal memorandum. I don't see that as being sent to Carabetta, or at least not initially. This is memorandum for directors of housing, multifamily housing directors, and so forth. Well, I believe, Your Honor, it was a public document because it announced which properties would be funded under the carve-out provision because it attached schedules of the properties on HUD's queue in the different areas and set out the processing instructions. When was the first time Carabetta was told that they wouldn't get all of their properties funded? Your Honor, I don't know the exact date. Was there some point at which, obviously some point before now, because they know it now. Was there any finding as to what happened after January 24, 1997, when this memo was sent internally to HUD? What was the nature of the communication to Carabetta that would have told Carabetta, sorry, you're not getting what you thought you were going to get under your agreement? Your Honor, I'm sorry. I don't know in the record. I don't have a date or a document. I'm not sure. So that's the point, though, is that the record doesn't support you anymore and it supports them. And yet, things seem to go forward with you giving them some share of what they had coming under the repayment program under the guise of this new capital loan program. Well, under HUD's interpretation, the repayment agreement was gone and they funded the seven properties because they were on the carve-out. But that, again, that's your interpretation. There's nothing in the record. We are hereby notifying you that the repayment agreement is gone, right? And henceforth, you're going to have to take your chances on the capital loan program. Right, but there's also nothing where HUD said we're substituting the capital loans for the equities. We went over that with Mr. Rosenbaum a minute ago. And on the tax issue, Carabetta's whole damages claim was based upon the expectation theory of damages, a lost investment income theory. And the trial court correctly concluded, as really a matter of common sense and economic reality, that the whole point of the equity takeout was so that Carabetta would invest and the reasonable return on that investment would have been taxable. And in fact, Carabetta's proof at trial with respect to the tax brackets of the dozens of partners in the enterprise was that they were in the 35%-plus tax bracket, so that denying the tax gross-up was consistent with the whole theory on which the damages case was tried, the discounted cash flow methodology. And the net amount to which Carabetta refers still was an amount of money that... What's the dollar amount on this? It's approximately $10 million. On this tax gross-up? The tax gross-up. It would have been higher. Around $14 million had Carabetta prevailed on some of the preservation value issues at trial, which on either side appealed, but right now... And at the end of the trial court's decision, he listed out the deductions for each element of damages. Similarly, the Salford Park was about $9 million. That's a high-dollar item as well. And on Salford Park, basically what's at issue there is an interpretation of promises that Salford Park had made in the 1983 youth agreement when it accepted the flexible subsidy assistance loan for a troubled project at that time. And in Volume 7 of the appendix in the beginning pages is a handbook that kind of explains that program. But essentially, the flexible subsidy loan program that Carabetta accepted... And this is the only property. It's in a unique category. At that time, Carabetta committed to stay in the low-income housing program through the year 2010. And it had already received, essentially, the incentives that HUD was offering at that time. Essentially, what Carabetta wanted later was... You know, they saw other incentives and wanted a better deal, but the trial court... Ms. Vanderman, you're well over your extended time. Oh, I'm sorry. Do you want to just make a concluding statement? Well, essentially, Carabetta had... HUD considered Carabetta's request to exit the program in Southford Park and gave reasons for denying it. Thank you. Thank you. Mr. Rosenbaum, your opposing party has given you an opportunity for rebuttal on the tax and the Southford Park issues. Thank you, Your Honor. First, Judge Rader, to give you more precise numbers as to what's at stake for those two matters. For the tax gross-up, it's $7.7 million as a stand-alone issue. And Southford Park, as a stand-alone issue, is $5.1 million. The court may be aware that the parties jointly submitted a calculator that allows all these things to be worked through. Now, those are stand-alone issues. There's some synergy. But as stand-alone matters, that's how much they're at stake with these matters. With respect to the tax gross-up, we would submit that any time a party was to receive money on a tax-free basis, almost inevitably that money, the investment of that money, would produce taxable income. And that would be true for the Sal Talman situation or the home-saving situation. But nonetheless, this court has properly found that one is entitled to a tax gross-up in that circumstance because if one is awarded as damages that same amount of money that one would have received tax-free and yet must immediately pay, for example, 35% taxes on it, the remaining amount of money which you now have to invest is 35% less than it would have been had the contract been performed. The fact that both the money you should have received and the money you're now receiving as damages will, when invested, produce taxable income really has no bearing on the matter. Those wash each other out. The key is that the plaintiff be awarded an amount of money that will put him or her in the same situation they would have been in had the contract been performed to begin with. So the only question then is, does the fact that our clients have the obligation to repay the loan at some point in the future somehow cause what would otherwise be, we think, a very simple application of the rules? Does that somehow change? And our view is it doesn't. The reason it doesn't is because we have accounted separately already for the repayment obligation. We have done that by figuring out the present value of that future repayment obligation and deducting that from our claim from the get-go. And so if the $500,000 loan required us to put aside $50,000 because 50 years later it would be worth $500,000, then we put aside that $50,000 and our claim now is only for $450,000. And that's our damages claim. At that point, we view the $450,000 as being the same as any other sum of money that should have been paid under a contract. But it would have been tax-free for the reasons we described, and therefore it's entitled to a tax gross just like this court rule in the Sovereign Home Savings. With respect to Salford Park, that is its own set of issues, their CARABEDA had a commitment that it had entered to with respect to that property, but it also had negotiated the right to withdraw from that commitment unless HUD could provide a justification not to allow it to do so. In other words, consent had to be granted, which consent would not be unreasonably withheld, was the phraseology of that agreement. The case law provides that under the circumstances, HUD had an obligation to articulate legitimate reasons not to allow CARABEDA to exercise, or the owners of Salford Park to exercise that right of withdrawal. They proffered two reasons. The first of which was they said even if you exercise that right, in fact, you don't get to withdraw from the obligations you took upon yourself. We have tracked the language in our briefing. That is simply not a logical or appropriate or viable interpretation of that language because the right to withdraw was the right to withdraw from the program, and so for HUD to say even if you exercise that right, you wouldn't have been able to withdraw from the program would render that agreement a nullity. The court below didn't disagree with us on that issue. It didn't make a direct finding, but it said we had a very reasonable position. What the court said was they weren't sure whether even if we did have the right to withdraw from that, that meant we were entitled under the repayment agreement to incentives, and so that's the second question. Our view is that it's perfectly obvious that we were. The repayment agreement on its face says that Salford Park is engaged in discussions and appeal with HUD as to whether it had the right to withdraw from this other program. Mr. Rosenbaum, in the interest of equity, unless my colleagues have questions, which will predominate, of course, I think we will ask you if you have any final closing statement. We think under those circumstances Salford Park did qualify. Thank you. Thank you very much. Case will be taken under advisement. Thank you.